UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                                        :
MELISSA CAMAROTA                                        :         3:19 CV 0133 (RMS)
                                                        :
V.                                                      :
                                                        :
COMMISSIONER OF                                         :
SOCIAL SECURITY                                         :         DATE: JANUARY 13, 2020
                                                        :
------------------------------------------------------- x

RULING ON THE PLAINTIFF"S MOTION FOR ORDER REVERSING THE
COMMISSIONER'S DECISION AND ON THE DEFENDANT'S MOTION FOR AN ORDER
AFFIRMING THE COMMISSIONER'S DECISION

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["DIB"] and Supplemental Security Income ["SSI"].

I.  ADMINISTRATIVE PROCEEDINGS

On June 19, 2015, the plaintiff filed applications for DIB and SSI, claiming she has been disabled since September 2, 2014,[1] due to "epilepsy, irregular heartbeat, neck fused, and back problems." (Certified Transcript of Administrative Proceedings, dated April 1, 2019 ["Tr."] 199-213, 241). The plaintiff's application was denied initially, (Tr. 120-129), and upon reconsideration. (Tr. 145-163). On November 2, 2017, a hearing was held before Administrative Law Judge ("ALJ") Barry H. Best, at which the plaintiff and a vocational expert testified. (Tr. 34-57). The plaintiff was represented by an attorney. (*Id.*). On December 28, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 13-25). On November 26,

---

[1] At the hearing, the plaintiff amended the alleged onset date to February 18, 2015. (*See* Tr. 38 ("Ms. Camarota and I have discussed changing the alleged onset date . . . She actually stopped working . . . February 18, 2015.)).

2018, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision final. (Tr. 1-5).

On January 29, 2019, the plaintiff filed her complaint in this pending action (Doc. No. 1). On January 31, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned. (Doc. No. 7). On April 1, 2019, the defendant filed the administrative transcript. (Doc. No. 8). The plaintiff filed her Motion to Reverse on July 9, 2019, (Doc. No. 16), with brief in support, (Doc. No. 16-1 ["Pl.'s Mem."]), and Statement of Material Facts. (Doc. No. 16-2). On September 16, 2019, the defendant filed his Motion to Affirm, (Doc. No. 1), with brief in support, (Doc. No. 19-1 ["Def.'s Mem."]), and Statement of Material Facts. (Doc. No. 19-2). For the reasons stated below, the plaintiff's Motion to Reverse (Doc. No. 16) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 19) is DENIED.

II.  FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statement of Facts. (Doc. Nos. 16-2, 19-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

The plaintiff testified at a hearing before the ALJ on November 2, 2017. (Tr. 34-57).[2] At the time of this hearing, the plaintiff was thirty-nine years old and living with her husband and eight-year-old son in a second-floor apartment. (Tr. 39-40). She had to climb stairs to reach her apartment. (Tr. 40). She graduated from high school and completed two years of college, but she

---

[2] The original page nine of the hearing transcript is missing from the record. Looking at the next page, it appears that the plaintiff and the ALJ may have discussed Dr. Dougherty, the plaintiff's treating physician, on the missing page. (*See* Tr. 42 ("Are you getting ongoing medical treatment from sources, other than Dr. Doorti [sic] . . .")). The missing page is not necessary to the Court's decision granting the plaintiff's motion.

did not obtain a college degree. (*Id.*). She had not worked since February 2015. (Tr. 41). She previously worked as a manager in a doughnut shop and as a catering manager. (*Id.*).

The plaintiff testified that she saw Nurse Practitioner Kim Kurey every four weeks for pain management. Ms. Kurey did "trigger point shots" in her neck and back and prescribed her medication. (Tr. 43). The plaintiff testified that she had the following medication regimen: extended release OxyContin, Oxycodone, Methocarbamol (a muscle relaxer), Lamictal (for epilepsy), Gabapentin for neuropathy, and amitriptyline for migraines. (Tr. 44-45). She also saw Dr. Stefana Pecher for medicinal marijuana, which she used two to three times a day, and Dr. Olivia Coiculescu for her epilepsy. (Tr. 44). She testified that Dr. Coiculescu would "send[] [her] for [her] nerve conduction tests." (*Id.*). She also testified that she recently had a series of three shots for ocular headaches. (Tr. 43). When asked about side effects from her medications, the plaintiff testified that they kept her awake and made her unable to concentrate. (Tr. 45).

According to the plaintiff, she "usually [got] about three hours of sleep" and woke up around 7:00 a.m. (*Id.*). She would "lay on [her] heating pad, probably for about an hour or so." (*Id.*). She then helped her son with his studies; he is "homeschooled because [she] cannot physically bring him to school." (Tr. 46). Her husband would make lunch and dinner before he left for work so that she could "just warm things up." (*Id.*). She showered "probably twice a week" with her husband's help. (*Id.*). She did not do any of the food shopping, sweeping, vacuuming, or washing dishes, but she did fold laundry. (*Id.*). She watched "about an hour and a half" of television a day. (Tr. 47). She also read and played games on her phone but did not use a computer. (*Id.*). She would drive "every couple months." (*Id.*). The plaintiff testified that the most she could lift or carry would be "about seven pounds"; if she tried to lift more than seven pounds, she would "be in excruciating pain" and "[p]ossibly fall." (Tr. 48). She also testified that she would only be able to

3

stand or walk for "about 10 or 15 minutes" before needing to sit down, and that she would only be able to sit for "the same." (*Id.*).

The plaintiff testified that in early 2014, while she was working, she began having problems at work. (Tr. 49). She started "dropping things" and she "wasn't able to concentrate." (*Id.*). She also missed worked "[s]everal times" unexpectedly. (*Id.*). When asked about her epilepsy, the plaintiff testified that she took Lamictal and saw her neurologist "every couple [of] months." (*Id.*). The medication had been helping, but she had recently had a seizure in her sleep. (*Id.*). She similarly testified that her migraines had "gotten a little bit better," but that "about six months ago" she started getting "really bad ocular headaches." (Tr. 50). As to her neuropathy, the plaintiff testified that it had gotten worse after her second surgery. (Tr. 51).

Kenneth R. Smith, a vocational expert ("VE"), also testified at the plaintiff's hearing. The VE testified that the plaintiff's past work as a doughnut shop manager corresponded with "fast food services manager," a skilled occupation typically performed at the light exertional level but performed at the medium exertional level as reported by the plaintiff. (Tr. 53). He testified that the plaintiff's past work as a catering manager corresponded with "food service manager," also a skilled occupation typically performed at the light exertional level, though the plaintiff had "noted lifting and heavy exertional range, frequent lifting of 50 pounds." (Tr. 53-54).

The ALJ then asked the VE to assume the following hypothetical individual: an individual of the plaintiff's age, education, and work background, with limitations of no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling; no work on scaffolds or ladders or ropes; and no work that requires activity at or above shoulder level. (Tr. 54). Such individual would also be limited by pain or effects of medication to uncomplicated tasks that are consistent with the

4

elements of unskilled work activity. (*Id.*). The ALJ asked the VE to address both light and sedentary exertional levels when answering the ALJ's questions. (*Id.*).

In response to questioning, the VE testified that the hypothetical individual described above could not perform the plaintiff's past work. (Tr. 54). The hypothetical individual, if limited to the light exertional level, could perform the occupations of general office clerk, office helper, assembler, and packager. (*Id.*). If limited to the sedentary exertional level, the hypothetical individual could perform the occupations of assembler and inspector. (*Id.*). When asked whether the hypothetical individual, with an additional limitation of not more than occasional handling and fingering, could perform the jobs referenced above, the VE answered in the negative. (Tr. 55). The VE also testified that one absence each month was tolerable and that an individual who was off task ten percent or more during the workday would have difficulty "keeping up with the job and ultimately, holding on to the job." (Tr. 56). Finally, the VE testified that none of his previous answers would change if the hypothetical individual was not able to work at unprotected heights, operating dangerous, moving machinery or driving heavy equipment on the job. (Tr. 56).

### III.     THE ALJ'S DECISION

Following the five-step evaluation process,[3] the ALJ found that the plaintiff met the insured status requirements through March 31, 2018, (Tr. 18), and that the plaintiff had not engaged in

---

[3] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former

5

substantial gainful activity since February 18, 2015, her amended alleged onset date. (Tr. 18, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ concluded that the plaintiff had the severe impairments of status post cervical fusion and seizure disorder versus pseudoseizure disorder, (Tr. 18, citing 20 C.F.R. §§ 404.1520(c), 416.920(c)), but that she did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926)). He also found that the plaintiff's history of a thyroid nodule, reflux, and anemia were nonsevere impairments. (Tr. 19). The ALJ determined, after careful consideration of the entire record, that the plaintiff had the residual functional capacity ["RFC"] to perform light work, but with limitations: "[she] is able to occasionally climb, balance, stoop, kneel, crouch and crawl but can never climb ladders, ropes and scaffolds"; "[she] should not be exposed to unprotected heights, dangerous machinery and automotive equipment"; "[she] should not perform work at or above the shoulder level"; "due to pain and medications, [she] is limited to maintaining concentration and attention for uncomplicated work, consistent with 'unskilled' work tasks, over an eight hour work day, assuming short work breaks on average every two hours." (Tr. 19).

The ALJ found that the plaintiff was not able to perform her past relevant work as a doughnut shop manager or catering manager. (Tr. 23, citing 20 C.F.R. § 404.1565). The ALJ then noted that the plaintiff was 37 years old and therefore a "younger individual age 18-49," that she had at least a high school education, and that she was able to communicate in English. (Tr. 24). The ALJ indicated that "[t]ransferability of job skills [was] not material to the determination of

---

employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

disability because using the Medical-Vocational Rules as a framework support[ed] a finding that the plaintiff was 'not disabled,' whether or not the claimant has transferrable job skills." (*Id.*). The ALJ found that there were jobs existing in the national economy that the plaintiff could perform, including those of office clerk, assembler, and packager. (*Id.*). Accordingly, the ALJ concluded that the plaintiff was not under a disability from February 18, 2015, through the date of the decision, December 28, 2017. (Tr. 24-25, citing 20 C.F.R. § 404.1520(g)).

III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the

reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

IV.   DISCUSSION

The plaintiff first argues that the ALJ failed to develop fully the record. (Pl.'s Mem. at 4). According to the plaintiff, the administrative record is missing a portion of her treating neurologist Dr. Coiculescu's medical records. (*Id.*). The plaintiff also argues that the record is missing certain medical records from Dr. Doherty, the plaintiff's treating neurosurgeon. (*Id.* at 5-6). Additionally, the plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence. The plaintiff specifically argues that "the evidence does not support a finding that [the plaintiff] was capable of such extensive use of her upper extremities." (Pl.'s Mem. at 7).

The defendant responds that the ALJ adequately developed the record, and the fact that the plaintiff was represented by counsel at the hearing precludes her from arguing now that the record before the ALJ was incomplete or that medical records were missing. (Def.'s Mem. at 4-7). In addition, the defendant claims that substantial evidence from a developed record supports the ALJ's RFC assessment. (Def.'s Mem. at 7-11).

A.   THE ALJ FAILED TO DEVELOP THE RECORD

On appeal, this Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation and internal quotations omitted). The issue of whether

an ALJ has satisfied his obligation to develop the record is one that "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the plaintiff is represented by counsel. *Id.* (citation omitted). An ALJ, however, is "required affirmatively to seek out additional evidence only where there are obvious gaps in the administrative record." *Eusepi v. Colvin*, 595 Fed. App'x. 7, 9 (2d Cir. 2014). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Moreau v. Berryhill*, No. 17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018).

Here, the plaintiff first argues that her records from Dr. Coiculescu after September 2016 are missing. In support of this assertion, the plaintiff points to her November 2017 hearing testimony. When asked if she was receiving "regular medical care" from "[a]nyone else" "at this time," she testified that Dr. Coiculesci was her "regular neurologist." (*See* Tr. 44 ("I have a neurologist that I see . . . for my nerve conduction tests and stuff like that, which I just had"; naming Dr. Coiculesci as her neurologist)). A review of the record reveals that Dr. Coiculescu's office responded to the plaintiff's April 3, 2017 request for all records from "7/8/16 to present" on April 17, 2017, providing records reflecting visits only up to September 21, 2016. (Tr. 1207-1268). Nothing in the record indicates that anyone contacted Dr. Coiculescu to request the plaintiff's records from April 2017 to November 2017. Nor did the ALJ and counsel discuss such records at

9

the hearing. Thus, although neither side has confirmed their existence, it appears that Dr. Coiculesci may have records that were not included in the administrative record.

The plaintiff similarly argues that Dr. Doherty's records from late 2016 and 2017 are missing, relying on a reference in the record to a November 2016 "appointment with neurosurgical group" for which no treatment notes appeared in the record. (Pl.'s Mem. at 5-6). The plaintiff notes that "Exhibit B14F . . . contain[s] the most recent medical treatment notes in the record from the Northeast Medical Group, comprising dates of service August 5, 2016 to February 24, 2017. . . This exhibit should have contained neurosurgical treatment notes generated in 2017." (Pl.'s Mem. at 5). The Court has reviewed this exhibit. (Tr. 1207-1268). In Northeast Medical Group's response to the plaintiff's request for records, it specifically notes that it "[is] not able to release records for Dr[.] Doherty as [he] is not part of our group of providers." (Tr. 1213). Therefore, the plaintiff is incorrect that Dr. Doherty's records should have been included in this exhibit.

However, a review of the administrative record strongly suggests that records from Dr. Doherty are missing. The administrative record does not include any medical records from Dr. Doherty or his physician's assistant, Mr. Arthur Welch, for any dates after February 2016. (Tr. 746). Nevertheless, Dr. Doherty is listed as the ordering and attending physician for the plaintiff's CT scan on November 6, 2016, (Tr. 1273), and, in his October 22, 2017 medical source statement, Dr. Doherty indicated that he saw the plaintiff every three months in the section asking for "[f]requency and length of contact." (*See* Tr. 1765 (responding "Q3 months")). These facts corroborate the plaintiff's assertion that Dr. Doherty's records from late 2016 and 2017 are missing. Moreover, the April 2017 letter from Northeast Medical Group referenced above raises the question as to whether anyone requested Dr. Doherty's records from his office after Northeast Medical Group indicated that it was not able to release them. (*See* Tr. 1213).

The Court finds that the absence of Dr. Doherty's records was an obvious gap that the ALJ had a duty to fill. Dr. Doherty was one of the plaintiff's treating physicians. It is well established that "the SSA recognizes the 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). However here, when faced with a potentially incomplete record, with records from Dr. Doherty likely missing, the ALJ did not recontact him to confirm whether additional records existed and, if they did, to obtain them. Contrary to the defendant's argument, the ALJ had a duty to do so even though the plaintiff was represented by counsel at the hearing. *See Perez*, 77 F.3d at 47. At no time during the hearing did the plaintiff's counsel or the ALJ discuss those medical records.[4] Thus, this is not a situation where, for example, the plaintiff's counsel represented to the ALJ that he would submit the records. *See Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. 2015) (summary order) (holding that the ALJ fulfilled his duty to develop the record where counsel volunteered to secure certain medical records, the ALJ later contacted counsel to remind him that no evidence had been received and that "a decision would be made on the existing record unless the evidence was submitted," and counsel then represented he had "nothing further to add" to the record).

---

[4] The only discussion of medical records during the hearing was the following exchange, which occurred in the context of referencing Nurse Practitioner Kurey's treatment:

> A: They're – I have ocular headaches from the four level fusion that's in my neck, so in order to try to relieve some of them, they put cortisone into my ocular lobes on the back of my skull.
> ALJ: Do we have those records, Mr. McCloskey?
> ATTY: Your Honor, I –
> ALJ: They're included in B-16F?
> ATTY: I believe that's correct, Your Honor, yes.

(Tr. 43).

Remand is, therefore, warranted because the ALJ committed legal error by failing to recontact Dr. Doherty to obtain additional records or confirm that none existed. To the extent additional records exist, they would have likely impacted the ALJ's decision. In his decision, the ALJ discounted Dr. Doherty's opinion[5] in part because (1) "Dr. Doherty has apparently not examined the [plaintiff] for an extended period"; and (2) "[t]here are no examinations from Dr. Doherty in 2017 or 2016 (in February[] 2016, Dr. Doherty reviewed the [plaintiff's] scans to see if she was a candidate for further surgery, but he did not examine [her])." (Tr. 22). Had the ALJ obtained records from Dr. Doherty from late 2016 and 2017, he may have afforded more weight to Dr. Doherty's opinion. Under these circumstances, a remand is appropriate for the ALJ to investigate whether the records exist and, if so, to reevaluate Dr. Doherty's opinion consistent with those records. It is not clear whether additional records from Dr. Coiculescu would have similarly impacted the ALJ's decision. However, in light of the Court's conclusion that a remand is warranted for further development of the record, upon remand, the ALJ shall also investigate whether additional records from Dr. Coiculescu—or any other of the plaintiff's treating physicians—exist.[6]

## V. CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is GRANTED such that this case is remanded for further development of the record, reweighing of the evidence in light of any new information, a *de novo*

---

[5] Dr. Doherty had opined that the plaintiff would likely be absent from work "about four days per month," is capable of only low stress work, and would be "off task" 25% or more of a typical workday. (Tr. 1767-68). He opined that she could rarely twist or stoop, never crouch or squat, occasionally climb stairs, and never climb ladders. (Tr. 1767). In his opinion, she could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. (*Id.*). He also noted that she would need to take unscheduled breaks during a workday, and that she would need a job that permits shifting positions at will from sitting, standing, and walking. (Tr. 1766).

[6] Given the Court's conclusion that the ALJ erred in not developing fully the administrative record, the Court will not address the plaintiff's second argument that the ALJ's RFC determination was not supported by substantial evidence.

hearing before an ALJ, and a new decision. The defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 19) is DENIED.

Dated this 13th day of January, 2020 at New Haven, Connecticut.

                                                                                           /s/Robert M. Spector, USMJ
                                                                                          Robert M. Spector
                                                                                          United States Magistrate Judge